CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
MAY 18 2006
JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Criminal No. 5:04CR00017 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| DONALD EUGENE SYNDER | ) By: Samuel G. Wilson |
| | ) United States District Judge |

The United States has charged the defendant, Donald Snyder, with making a threat against the President of the United States in violation of 18 U.S.C. §871 and with using a telephone to "make a threat to unlawfully damage or destroy a building by means of fire or other explosive" in violation of 18 U.S.C. §844 (e). The court committed Snyder to the custody of the Attorney General to determine Snyder's competency to stand trial. Snyder's psychiatrist has reported to the court that Snyder is not competent to stand trial and that there is not a "substantial probability that his competency will be restored in the foreseeable future." Snyder disputes the psychiatrist's conclusion, and the court held a hearing to resolve the matter. The court now concludes that Snyder lacks a rational understanding required for competency, is unable to assist properly in his own defense, and is not likely to be restored to competency in the foreseeable future. Accordingly, the court recommits Snyder to the custody of the Attorney General for an additional study to determine whether, as a result of Snyder's condition, Snyder's release would create "a substantial risk of bodily injury" to another person or "serious damage" to another person's property, and, if so, whether "suitable arrangements" can be made for Snyder's care in state custody.

**I.**

The United States filed a criminal complaint against Snyder alleging that he threatened to bomb the White House. According to the supporting affidavit of Michael Ross, a Special Agent with United States Secret Service, on June 10, 2004, a desk attendant at a motel in Winchester, Virginia, overheard Snyder mention that Snyder had been arrested three years earlier for threatening to bomb the White House. The same day a Winchester police officer overheard Snyder state: "[b]e up here in a couple of hours. I'll be on the news. You remember 9/11? I'll be 6/11." Local authorities took Snyder into custody, and Ross and another Special Agent interviewed him. Ross' affidavit recounts that Snyder told them that he had been "attempting to contact the Associated Press Washington bureau and had made the comment about a bomb threat at the White House because he wanted to draw attention." He stated that "he wanted to convince people that he is the Holy Spirit" and that he used the words "bomb" and "White House" in his comments to "get attention." When questioned as to how he would bomb the White House, Snyder "replied that he knows how to get explosives and went on to explain that he . . . would steal dynamite from a construction site."

Following an initial appearance, the United States Magistrate Judge ordered a competency evaluation by a local psychologist, Dr. Jeffrey Fracher. Dr. Fracher, who is a forensic and licensed clinical psychologist, interviewed and examined Snyder on November 3, 2004. According to Fracher's report, Snyder recounted his considerable psychiatric history dating to the late 1980s, with "multiple psychiatric hospitalizations" beginning in 1992. The report explains that Snyder was "actively delusional" during the interview and examination:

> Despite his current medication regime, he remains actively delusional and grandiose.

2

Case 5:04-cr-00017-SGW   Document 41   Filed 05/18/06   Page 2 of 11   Pageid#: 41

> His delusions and grandiosity center entirely on religious matters. For example, Mr. Snyder believes that he is an agent of God and that specific passages in the Bible were written about him alone. At times, he has believed himself to be the Holy Spirit who was on earth to bring on Armageddon. When seen for the evaluation, Mr. Snyder denied that he currently believes himself to be the Holy Spirit but instead is only a messenger from God. Mr. Snyder also described for this examiner a bizarre and convoluted scenario in which he indicated that God designed a language for him that He transmitted to him through the televison show, "L.A. Law." According to Mr. Snyder, the phrase, "serious juice" was used on the show several years ago and was designed to communicate to him from God that the phrase could be written in such a manner as to form a cross and, that the name Jesus could then be derived from the phrase. He indicated that in Biblical times, "they named the boy Jesus so that I could get the name off of serious juice in my lifetime." He went on to provide an increasingly bizarre and delusional narrative about the phrase, "serious juice" that was incomprehensible.

Dr. Fracher observed that despite the fact that Snyder "demonstrated gross and observable defects in his capacity to make reasonable and realistic life decisions due to his grandiosity and delusional beliefs," he "demonstrated basic factual legal knowledge regarding the charges against him and the workings of the Federal Court system" as evidenced by the following:

> He displayed familiarity with courtroom personnel and proceedings. He fully understands the adversarial nature of the court proceedings and his own role in assisting his attorney in his defense. He does not presently evidence of grossly disorganized behavior or thoughts that would preclude his cooperation with his attorney when facing the charges which are pending against him.

Dr. Fracher concluded that Snyder, despite his delusions, was "capable of participating adequately in his own defense."

Based on Dr. Frasher's report, the magistrate judge found that Snyder was competent to stand trial. The grand jury returned an indictment against him, and the court arraigned him and, later, set his trial for January 2005. During the arraignment on a superseding indictment returned against Snyder two weeks before his scheduled trial date, the magistrate judge reconsidered his

earlier determination that Snyder was competent to proceed and committed him to the custody of the Attorney General for further evaluation to determine Snyder's competency "to stand trial as that term is defined under 18 U.S.C. § 4241(a)." The magistrate judge recommended that Snyder receive a medical and psychiatric evaluation and treatment at the Federal Medical Center in Butner, North Carolina (Butner), as Snyder had previously received treatment at Butner. When Snyder arrived at Butner, prison officials decided that Snyder did not require inpatient medical treatment and instead sent him to the Metropolitan Correctional Center (MCC), an outpatient forensic study site.

Dr. William J. Ryan, a licensed psychologist, interviewed and examined Snyder at MCC in March and April 2005. According to Dr. Ryan's report dated April 15, 2005, Snyder banged his head and attempted to drown himself in a toilet on March 25, 2005, and as a result, prison officials placed Snyder on suicide watch for six days. Over time, Snyder became "incoherent and demanding" and "expressed urgent desires to contact the Secret Service or the President." Dr. Ryan observed that, though Snyder was initially "logical, coherent, and relevant," there "was an apparent loosening of associations when Snyder began to speak of his religious preoccupation and his grandiose delusions about being a prophet of God." An inmate provided the unit manager with a sketch that Snyder allegedly drew of a cross with the words "Serious Juice" written on it and the words "Precious Blood of Christ" written below it, which supposedly represented the vision Snyder received from God.

Though Snyder was initially capable of assisting his counsel and participating in courtroom proceedings "to a limited degree," Dr. Ryan observed that Snyder's condition had deteriorated. Dr. Ryan concluded that Snyder "has a factual but not a rational understanding of

4

the proceedings against him and that . . . he [was] not capable of assisting counsel with his defense," and diagnosed Snyder with Schizoaffective Disorder, Bipolar Type.

On May 3, 2005, the court conducted a competency hearing, pursuant to 18 U.S.C. § 4241(c) and (d) and determined that Snyder was incompetent at that time to stand trial. Accordingly, the court committed Snyder to the custody of the Attorney General and recommended hospitalization and treatment at Butner. The court ordered Snyder's hospitalization for a reasonable time period, not to exceed four months, to determine whether "there [was] a substantial probability that in the foreseeable future he [would] attain the capacity to permit the trial to proceed."

Dr. Edward E. Landis III, the Director of Psychology Training at Butner, interviewed and examined Snyder.[1] In a report dated October 18, 2005, Dr. Landis observed that Snyder's behavior declined during the evaluation period, and that by October 10, 2005, "Snyder experienced an increase in manic irritability, agitation, and intrusion of grandiose and hyperreligious [sic] delusions that grossly interfered with his daily behavior." As a result, the medical staff placed Snyder in a controlled housing unit and observed Snyder engaging in "bizarre rituals" and "clearly hallucinating" at times. Dr. Landis diagnosed Snyder as having a Bipolar I Disorder with psychotic features.

Dr. Landis noted that Snyder's understanding of courtroom procedures and legal issues relevant to his case was "superficially accurate" and that Snyder had a factual "but not rational understanding of the charges and proceedings against him" and was "unable to assist properly in

---

[1] Dr. Ralph Newman, a staff psychiatrist, provided psychiatric consultation and assisted in the preparation of the report.

5

his defense." Dr. Landis recommended that the court order Snyder's continued commitment for treatment pursuant to 18 U.S.C. § 4241(d) and stated: "[t]hough he has not improved to such an extent as to restore his competency, in our opinion there is a substantial likelihood that he may regain his competency with continuation of appropriate medical treatment."

On the recommendation of Butner's warden, the court extended Snyder's commitment on two occasions. On February 13, 2006, the court received a second report dated February 2, 2006, from Dr. Landis. In that report, Dr. Landis chronicled Snyder's continued deterioration and noted that "after a period of medication non-compliance [Snyder] experienced a harrowing, protracted episode of severe psychosis." Despite the fact that he consented to treatment with Haldol Decanoate, Snyder remained "grossly impaired" and "often spoke in incoherent or impertinent phrases." Snyder eventually showed gradual improvement, though "[i]t remained unclear whether his improvement was the rest of treatment efforts or simply part of the cyclic nature of his mental illness." At this improved stage, Snyder denied certain behaviors that the staff had repeatedly documented and also reported having "healed" patients in other psychiatric hospitals where he had previously been a patient. According to Dr. Landis, Snyder "view[s] his legal predicament as a form of suffering associated with his role as a savior for mankind."

In a reversal from his previous report, Dr. Landis concluded that "given the intractability of his symptoms since his last admission [at Butner], it appears unlikely that he will attain the capacity to allow a trial to proceed in the forseeable [sic] future, even with continued treatment." Therefore, Dr. Landis recommended an evaluation for a possible civil commitment pursuant to 18 U.S.C. § 4246.

The court conducted a competency hearing on March 13, 2006, and heard testimony from

6

Snyder and Dr. Landis.[2] Snyder testified that he had discussed the February 2, 2006, report with his attorney and that he did not agree with its conclusion. Explaining his disagreement, Snyder testified that he had observed events which some people consider miraculous and others consider delusional. Snyder also testified that he understands the prosecutor's and defense counsel's roles and that he had considered the possibility of an insanity defense. When asked if he remembered the events giving rise to the charges against him, Snyder responded in the affirmative and testified that he called the newspaper to talk about a vision he received from God, not to talk about a bomb. Snyder testified that he physically created a banner that represented his vision and that it included a cross and the words "serious juice" written on the side and bottom of the cross. Snyder testified that he received the vision for the banner in 1992 and that God chose him to share the vision. Snyder testified that the banner is a "central part" of his case and that at trial he wants to explain how the banner pertains to the White House.

In response, Dr. Landis testified that, though Snyder understands the roles of the prosecutor and defense attorney, he is unable to make rational use of that information. Dr. Landis, for example, referenced Snyder's testimony concerning the banner and how Snyder wanted to use the trial as an opportunity to discuss the banner, when, instead, he should be thinking about the best defense or how to achieve the most favorable outcome. Dr. Landis also testified that in a stable environment and with continuous treatment Snyder might continue at his present level of functioning for weeks.

## II.

To satisfy the constitutional minimum for competency to stand trial, a defendant must

---

[2]Dr. Landis testified via video conference.

have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and... a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402 (1960). A psychotic, delusional defendant "lacks the requisite rational understanding if his mental condition precludes him from perceiving accurately, interpreting, and/or responding appropriately to the world around him." Lafferty v. Cook, 949 F.2d 1546, 1551 (10th Cir. 1992). Although, at a superficial level, Snyder has a factual understanding of the criminal justice system, he does not have the "rational understanding" required for competency because he is delusional from a mental disease that substantially interferes with his ability to accurately perceive, interpret and respond to the world around him. It follows that he cannot stand trial.

It appears to the court that Snyder superficially understands the charges against him, the factual basis for those charges, his rights, the prosecutor's role, his counsel's role, the jury's role, and the court's role. It also appears that although his illness and symptoms are fluid and cyclical, as of the date of his last competency hearing, he was, however short-lived, oriented as to time and place. However, he remains delusional, and his delusions are substantially interfering with his ability to defend himself. In that regard, the court fully credits Dr. Landis' opinion that Snyder currently is not capable of rationally evaluating and assimilating information. Instead, as result of his delusions, Snyder is incapable of focusing on a proper defense and, for example, is viewing these court proceedings as an opportunity to discuss the religious significance of his "banner." In reaching this conclusion, the court distinguishes Snyder from those defendants courts have found delusional but, nevertheless, competent to stand trial. See, e.g., United States v. Zedner, 401 F.3d 36, 41-42 (2d Cir. 2005) (stating that institution's report found the defendant

8

was delusional but competent to stand trial and that the district court accepted the report); United States v. Morrison, 153 F.3d 34, 46 (2d Cir. 1998) (deferring to the district court's determination that defendant was competent to stand trial, though the record indicated the defendant was delusional or irrational during the trial). In contrast to those defendants, the court finds that Snyder's delusions have "strip[ed] him of the ability to realistically determine where his best interests lie" and to assist properly in his defense. See Lafferty, 949 F.2d at 1556 (stating that mentally ill, delusional defendant whose delusions "strip him of the ability to realistically determine where his best interests lie" lacks a "rational understanding" and is not competent).

There are three possible sequential steps under 18 U.S.C. § 4241 when competency to stand trial arises. See United States V. Ferro, 321 F.3d 756, 760 (8th Cir. 2003). First, the court must determine whether the defendant is competent to proceed--that is, whether he suffers from a "mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241 (a), (d). Second, if the court finds that the defendant is not competent to proceed, then the court is required to "commit the defendant to the custody of the Attorney General," and the Attorney General is required to hospitalize the defendant for treatment for a reasonable period of time, not to exceed four months, "to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity permit the trial to proceed." The statute authorizes the court to extend the commitment for "an additional reasonable period of time" until the defendant's "mental condition is so improved that the trial may proceed, if the court finds that there is a substantial probability" that it will improve within that additional period. 18 U.S.C. § 4241 (d)(2)(A). Third, if it becomes apparent that the

9

defendant will not attain sufficient capacity to proceed to trial within the foreseeable future, the court is required to conduct a hearing under the provisions of 18 U.S.C. § 4246. Essentially, under that section the court is required to determine whether the defendant's release would create "a substantial risk of bodily injury" to another person or "serious damage" to another person's property, and, if so, whether "suitable arrangements" can be made for the defendant's care in state custody.

Despite the severity of Snyder's illness, there was some optimism that Snyder could be restored to competency in the foreseeable future. Consequently, the court extended Snyder's treatment. However, it is now apparent that efforts to restore Snyder to competency within the foreseeable future have been exhausted. Thus, the court is at the third step of the evaluation process. Accordingly, the court will recommit Snyder to the custody of the Attorney General for evaluation and report in accordance with the provisions of § 4246.

III.

For the foregoing reasons, the court finds that Snyder lacks a rational understanding required for competency, is unable to assist properly in his own defense, and is not likely to be restored to competency in the foreseeable future. Accordingly, the court recommits Snyder to the custody of the Attorney General for an evaluation and report in accordance with 18 U.S.C. § 4246 as to whether Snyder's mental condition is such that his release would create a substantial risk of bodily injury to another person or serious damage to property of another and, if so, whether suitable arrangements for state custody and care are available.

10

**ENTER**: This May 18, 2006.

_____
UNITED STATES DISTRICT JUDGE

11